# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

GREGORY KENNON,

     Petitioner,

v.                                                  Case No. 8:21-cv-1185-CEH-TGW

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____/

## ORDER

Gregory Kennon, a Florida prisoner, timely filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.) Respondent filed a response opposing the petition. (Doc. 5) Kennon did not file a reply. Upon consideration, the petition will be **DENIED**.

## I.    Background

In July 2009, Crystal Johnson lived in an apartment complex in Bradenton, Florida, with her sister and her mother. (Doc. 5-4, Ex. 25, at 561-62). Johnson was six months pregnant at the time. (*Id.* at 689). Lawrence Funsch, the father of the child, stayed at the apartment "from time to time." (*Id.* at 562). He was a drug dealer, and he stored marijuana in a dresser in the apartment. (*Id.* at 743, 760; *see also* Doc. 5-3, Ex. 25, at 392-93).

At approximately 1:30 a.m. on July 12, 2009, intruders kicked in the front door of Johnson's apartment and told the occupants to "[g]et down." (Doc. 5-4, Ex. 25, at 699-701, 746-47). Funsch grabbed a firearm and exchanged gunfire with the intruders. (*Id.* at 744-46). A bullet fired by one of the intruders hit Johnson in the chest. (Doc. 5-3, Ex. 25, at 451-53). She died shortly thereafter. (*Id.* at 453). Her child was delivered via emergency caesarean section, but due to "extreme prematurity" and "compromised circulation," the child passed away eight hours later. (*Id.* at 454-55).

Within minutes of the shooting, passersby saw two men running from the apartment complex into a field. (Doc. 5-4, Ex. 25, at 668, 707-08). Shortly thereafter, Everrick Houston arrived at a nearby hospital with a gunshot wound to his chest. (Doc. 5-3, Ex. 25, at 484-85, 520-21). Two weeks later, Kennon was treated at the same hospital. (*Id.* at 474). The examining nurse observed an injury to Kennon's "right forearm" that was "consistent in appearance with" a gunshot wound. (*Id.* at 474-75). A physician assistant also examined Kennon and reached the same conclusion. (*Id.* at 505, 507-08). Kennon told the nurse that he had fallen off a motorcycle and "something fell on his arm." (*Id.* at 475). By contrast, he told the physician assistant that "something stuck [him]" after he fell onto a "railroad track." (*Id.* at 507).

Law enforcement found drops of blood on the sidewalk outside Johnson's apartment; they also located blood on a railing in the apartment complex. (*Id.* at 325, 330, 394-95). The blood directly outside the apartment matched a DNA profile belonging to Kennon. (Doc. 5-4, Ex. 25, at 802-03). The blood on the railing matched a DNA profile belonging to Houston. (*Id.* at 798-801). Law enforcement subsequently

2

executed a search warrant at Kennon's house. (*Id.* at 659). Officers located a 10-millimeter Glock magazine in a vehicle parked outside the residence. (*Id.* at 650, 659-60). 10-millimeter shell casings had been recovered from the scene of the crime, and several witnesses testified at trial that 10-millimeter ammunition is "fairly rare." (*Id.* at 578, 623; *see also* Doc. 5-3, Ex. 25, at 332). Kennon's DNA was present on the 10-millimeter magazine recovered from the vehicle, but law enforcement could not determine whether the casings found at the crime scene came from Kennon's magazine. (Doc. 5-4, Ex. 25, at 580, 801).

Kennon was ultimately charged with two counts of first-degree murder and one count of armed burglary of a dwelling. (Doc. 5-2, Ex. 5). Following a jury trial, he was found guilty as charged and sentenced to life in prison without the possibility of parole. (Doc. 5-5, Exs. 27, 28). The appellate court affirmed the convictions without an opinion. (*Id.*, Ex. 33). Kennon subsequently moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id.*, Ex. 35). The postconviction court summarily denied seven of Kennon's claims and denied the remaining claim after an evidentiary hearing. (*Id.*, Exs. 38, 45, 46). The appellate court reversed the summary denial of two claims "with instructions for the postconviction court to either attach records conclusively refuting Kennon's claims or, in the alternative, to conduct an evidentiary hearing." (*Id.*, Ex. 51, at 6). The postconviction court elected to hold an evidentiary hearing, after which it denied the two remaining claims. (*Id.*, Exs. 55, 57, 58). This time, the appellate court affirmed the denial of relief without a written opinion. (*Id.*, Ex. 63). Kennon's federal habeas petition followed. (Doc. 1).

3

II.     **Standards of Review**

A.     **AEDPA**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535

U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed Kennon's convictions and sentences without discussion. And it ultimately affirmed the denial of postconviction relief without explanation. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

### B.   Ineffective Assistance of Counsel

Kennon alleges ineffective assistance of trial counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and

resulting prejudice. *Id.* at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Kennon must show that counsel's alleged error prejudiced the defense, because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, Kennon must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA deference, the resulting standard of review is doubly deferential.") (internal quotation and citation omitted). "The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but

6

whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## III. Discussion

### A. Ground One

Kennon contends that trial counsel was ineffective for failing to investigate and call as a witness Roderick Hamilton. (Doc. 1 at 5). According to Kennon, Hamilton would have provided a "reasonable explanation" for the presence of Kennon's blood outside the victims' apartment. (*Id.*) In particular, Hamilton allegedly would have testified that two days before the shooting, he and Kennon had engaged in a "fistfight" at the victims' apartment complex. (Doc. 5-5, Ex. 35, at 317-A).

The postconviction court held an evidentiary hearing on this claim. Kennon testified that "around th[e] time" of the shooting, he "had had a fight" with Hamilton outside the victims' apartment, and that blood was "spilled" during the encounter. (*Id.*, Ex. 57, at 7). Kennon admitted that he did not tell his original attorney (Charles Lykes) about the alleged fistfight, even though Lykes represented him from the summer of 2009 until December 2010. (*Id.* at 12). Kennon claimed, however, that he told trial counsel Colleen Glenn about the fight once she took over the representation. (*Id.* at 11-12).

Hamilton—a five-time convicted felon—testified at the hearing as well. (*Id.* at 24). He stated that he had known Kennon "growing up," and that on July 10 or 11,

2009, he "physically assaulted" Kennon "in front of one of the apartment buildings" in the victims' apartment complex. (*Id.* at 18-20). Hamilton claimed that he had only "[j]ust recently" learned that his "testimony about this might be important." (*Id.* at 21). Nevertheless, Hamilton testified that he did not use any "memory aids" to help him recall the date of the encounter. (*Id.* at 21).

Glenn, Kennon's trial counsel, testified that her notes of meetings with Kennon contained no mention of "a fight with Roderick Hamilton." (*Id.* at 34). She also explained that the DNA evidence against Kennon "was the big problem in the case," and that she had "hired one or two experts to deal with that issue." (*Id.* at 35). According to Glenn, had Kennon mentioned a "potentially innocent explanation for his blood being at the scene," she "would have followed up on that." (*Id.*)

After the evidentiary hearing, the postconviction court rejected Kennon's ineffective-assistance claim in a written order. The court found that "both [Kennon's] and Hamilton's testimony on this issue" was "not credible," and "specifically [found] that [Kennon] did not inform trial counsel about the fight with Hamilton or request that it be investigated." (*Id.*, Ex. 58, at 2). In support, the court pointed to trial counsel's testimony that "she would have investigated any explanation for [the blood evidence] offered by [Kennon], but her notes contain no mention of Hamilton, the fight, or any explanation for the blood." (*Id.*) The court also cited Kennon's testimony that "he did not discuss this important issue with his prior attorney, who represented him for approximately sixteen months between 2009 and 2010, and he could not recall any details about the fight except that it happened around the time of the crime and they

8

fought over a girl." (*Id.*) Finally, the court noted that Hamilton lacked credibility because—"without the use of memory aids" and "despite only recently becoming aware of the significance" of the encounter—he was apparently "able to place the fight within [] 48 hours" of the shooting. (*Id.*)

The postconviction court reasonably concluded that trial counsel was not deficient for failing to investigate or call Hamilton as a witness. As explained above, the court gave no weight to Kennon and Hamilton's testimony at the evidentiary hearing. Based on that finding, the court concluded that Kennon "did not inform trial counsel about the fight with Hamilton or request that it be investigated." (*Id.*) "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011). Kennon has not shown by "clear and convincing evidence" that the court's credibility determinations were erroneous. 28 U.S.C. § 2254(e)(1). To the contrary, the court accurately summarized the testimony from the evidentiary hearing and gave a reasoned explanation of its decision to discount Kennon and Hamilton's testimony.

Having determined that Kennon never told trial counsel about the alleged fistfight, the court had no basis to find that she performed deficiently. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*

9

"The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* "Thus, what investigative decisions are reasonable depends largely on the information the defendant supplied." *Rizo v. United States*, 662 F. App'x 901, 913 (11th Cir. 2016). Moreover, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that [courts] will seldom, if ever, second guess." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995).

Here, the postconviction court reasonably determined that Kennon never told counsel about his alleged fight with Hamilton. Furthermore, there is no indication that counsel could have independently discovered the alleged encounter between the two men. In these circumstances, counsel's investigation cannot be deemed deficient. *See Newland v. Hall*, 527 F.3d 1162, 1202 (11th Cir. 2008) ("In evaluating the reasonableness of a defense attorney's investigation, we weigh heavily the information provided by the defendant."). Nor was counsel "deficient for failing to call a witness of whom . . . she [was] unaware." *Mejia-Rojo v. Sec'y, DOC*, No. 2:13-cv-9-SPC-DNF, 2015 WL 2449610, at *9 (M.D. Fla. May 21, 2015). Thus, the postconviction court reasonably determined that counsel did not render ineffective assistance by failing to investigate and call Hamilton as a witness. Ground One is denied.

## B.    Ground Two

Kennon argues that trial counsel was ineffective for failing to call his mother— Chauncey Julien—as an alibi witness. (Doc. 1 at 7; Doc. 5-5, Ex. 35, at 317-B). The postconviction court held an evidentiary hearing on this claim. Julien testified that on

10

the evening of the shooting, she and Kennon were "home in bed watching TV." (Doc. 5-5, Ex. 57, at 26-27). She clarified that she stayed up "until about 4:00 or 5:00, maybe 6:00 in the morning" because she "was ill and [Kennon] was in bed with [her]." (*Id.* at 28). On cross-examination, the prosecutor confronted Julien with testimony from her deposition, which was taken shortly before Kennon's trial. (*Id.* at 28-29). During her deposition, Julien had stated that she could not "recall what time [she] went to bed" on the evening in question. (*Id.* at 29). Julien also admitted on cross-examination that she was a convicted felon. (*Id.* at 30).

Trial counsel testified that before trial, she had filed a "notice of alibi" listing Julien as an alibi witness. (*Id.* at 36). At that point, "the game plan was to call her as a witness." (*Id.* at 40). During trial, however, counsel and Kennon "made the decision as a team" not to call Julien. (*Id.* at 36). Counsel explained that "we were concerned about the cross-examination and whether or not [Julien] was going to hold up under cross-examination." (*Id.* at 36-37). In addition, counsel noted that "if we were to present that alibi witness and the jury didn't believe it, then we [ran] the risk of them coming back with a guilty verdict just because they didn't believe that." (*Id.* at 37). Indeed, immediately after the State rested its case at trial, the court inquired about the notice of alibi and asked Kennon whether it was "[his] desire not to pursue the defense of alibi." (Doc. 5-4, Ex. 25, at 884). Kennon answered in the affirmative, stating that he had discussed with counsel "the pros and cons of whether or not to pursue that defense." (*Id.*)

11

Following the evidentiary hearing, the postconviction court rejected Kennon's ineffective-assistance claim in a written order. The court concluded that "trial counsel's advice not to call [Julien as a] witness was reasonable under the circumstances." (Doc. 5-5, Ex. 58, at 3). The court explained that "counsel's primary basis for advising [Kennon] against calling his mother—that she would not hold up well on cross-examination—proved well-founded during the evidentiary hearing." (*Id.*) In particular, Julien "offered specific details during the hearing about her and [Kennon's] whereabouts and activities on July 11 and 12, 2009, but was impeached with her deposition testimony from 2012 (seven years closer to the events in question), when she could not recall those same details." (*Id.*) The court also pointed to Julien's "felony record of unspecified length, including crimes of dishonesty and false statements," and her "self-evident" "bias as [Kennon's] mother." (*Id.*) Finally, the court noted that Kennon "voluntarily agreed with trial counsel's advice not to call his mother as an alibi witness," and that "[b]eyond [Kennon's] testimony that he 'felt pressured' by trial counsel in making this decision, there was no evidence presented to factually substantiate a claim of coercion or undue pressure." (*Id.*)

The rejection of this claim was reasonable. As noted above, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that [courts] will seldom, if ever, second guess." *Waters*, 46 F.3d at 1512; *see also Ball v. United States*, 271 F. App'x 880, 884 (11th Cir. 2008) ("Trial counsel's decisions with regard to [defendant's] alibi witnesses were quintessential trial strategy."). "[T]o show that counsel's performance was unreasonable, the petitioner must establish that

no competent counsel would have taken the action that his counsel did take." *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

The postconviction court reasonably concluded that counsel was not deficient for declining to call Julien as an alibi witness. Several strategic considerations supported that decision. First, Julien is Kennon's mother. "As a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias." *Bergmann v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995). Second, Julien is a convicted felon, and the prosecution likely would have impeached her on that basis had she testified at trial. *See Wilder v. Sec'y, Fla. Dep't of Corr.*, No. 3:19-cv-614-MMH-PDB, 2022 WL 2047865, at *16 (M.D. Fla. June 7, 2022) (noting that "counsel may have decided that a trial strategy of calling Brown, a convicted felon, as an alibi witness was not the best defense strategy"). Third, counsel believed that Julien would not hold up well under cross-examination—a belief that was confirmed by Julien's performance at the evidentiary hearing. *See Ball*, 271 F. App'x at 884 (holding that counsel was not ineffective for failing to call potential alibi witnesses because their testimony "would not have been particularly compelling and would have been subjected to vigorous impeachment"); *Dickerson v. United States*, No. 6:05-cr-016, 2009 WL 2016113, at *3 (S.D. Ga. July 8, 2009) (counsel not ineffective for failing to call witness who "was open to a withering cross-examination").

13

Given these strategic considerations, the Court cannot say that it was "patently unreasonable" for counsel to refrain from calling Julien as an alibi witness. *Kelly v. United States*, 820 F.2d 1173, 1176 (11th Cir. 1987). Thus, the postconviction court reasonably rejected Kennon's ineffective-assistance claim, and Ground Two is denied.

## C.    Ground Three

Kennon contends that trial counsel was ineffective for failing to object to testimony offered by Debra Porter, the nurse who examined him two weeks after the shooting. (Doc. 1 at 8). As noted above, Porter testified that during her examination, she observed an injury to Kennon's "right forearm" that was "consistent in appearance with" a gunshot wound. (Doc. 5-3, Ex. 25, at 474-75). She also testified that Kennon claimed to have fallen off a motorcycle, after which "something fell on his arm." (*Id.* at 475). According to Kennon, counsel should have (1) argued that Porter was not "qualified as a gunshot expert," (2) requested a *Frye*[1] hearing to challenge the scientific basis for Porter's testimony, and (3) objected to Porter's testimony on the ground that her opinion as to the cause of the injury was omitted from her "hospital reports." (Doc. 1 at 8; Doc. 5-5, Ex. 35, at 317-C).

The postconviction court rejected this claim. It began by finding that Porter "was properly qualified to testify regarding the cause of [Kennon's] injury." (Doc. 5-5, Ex. 36, at 5). The court pointed to Porter's testimony "regarding her education and

---

[1] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). At the time of Kennon's trial, *Frye* governed the admission of expert testimony in Florida state court. *See DeLisle v. Crane Co.*, 258 So. 3d 1219, 1227 (Fla. 2018) ("Following our repeated affirmations of the *Frye* rule, in 2013 the Legislature amended section 90.702 to incorporate *Daubert* in the Florida Rules of Evidence.").

training as a nurse, her ten years practicing, and [her treatment of] at least twenty to thirty gunshot injuries over the course of her career." (*Id.*) Citing Florida law—which permits a "medical professional who has examined a wounded person" to testify to "the probable cause of the wound"—the court held that Kennon's "proposed objection to [Porter's] testimony would have been meritless." (*Id.* at 5-6 (citation omitted)). Next, the court found that any request for a *Frye* hearing "would have been meritless" because Porter's "testimony was not based on new or novel scientific principles, but based on her own experience as a nurse having treated gunshot-related injuries." (*Id.* at 5-6). Because a *Frye* hearing "was not warranted" in these circumstances, the court held that counsel had no basis to request one. (*Id.*)

The court also rejected the argument that Porter's testimony was improper because her treatment "notes" did not refer to any "gunshot wounds." (*Id.* at 7). As the court explained, Kennon argued that Porter's testimony "should have been excluded as hearsay," and that "she did not qualify" for the hearsay exception in Fla. Stat. § 90.803(7), which permits the introduction in certain circumstances of "[e]vidence that a matter is not included in the . . . reports . . . of a regularly conducted activity." (*Id.*) The court noted that "Porter's testimony [regarding the cause of the wound] was based on her personal observation and firsthand examination of [Kennon's] injury." (*Id.* at 8). Because that testimony did "not involve out-of-court statements used at trial, the hearsay rule [was] inapplicable." (*Id.*) Thus, the court concluded, counsel was not deficient for failing to raise a hearsay objection. (*Id.*)

The postconviction court did not act unreasonably in rejecting Kennon's ineffective-assistance claim. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017). That is the case here. The postconviction court found that counsel was not ineffective because, as a matter of Florida law, each of Kennon's evidentiary objections lacked merit. (Doc. 5-5, Ex. 36, at 5-8). Thus, the state court "already has told us how the issues would have been resolved under Florida state law had [counsel] done what [Kennon] argues [s]he should have done." *Herring v. Sec'y. Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005). This Court is bound to defer to that determination. *See, e.g.*, *Mitchell v. Sec'y, Dep't of Corr.*, No. 8:19-cv-457-MSS-TGW, 2022 WL 846142, at *15 (M.D. Fla. Mar. 22, 2022) ("Whether the trial court would have admitted the expert's testimony under *Frye* and the state rules of evidence is an issue of state law, and a state court's determination of state law receives deference in federal court."), *aff'd*, No. 22-11310, 2024 WL 1208979 (11th Cir. Mar. 21, 2024); *Colville v. Dixon*, No. 3:21-cv-850-LAC-EMT, 2022 WL 877368, at *13 (N.D. Fla. Mar. 7, 2022) ("[T]he state court has already answered the question of whether the testimony identified by [petitioner] was objectionable as inadmissible hearsay—it was not. This court must defer to the state court's determination of state law."), *adopted by* 2022 WL 874949 (N.D. Fla. Mar. 24, 2022); *Maldonado v. Sec'y, Dep't of Corr.*, No. 8:15-cv-430-JDW-JSS, 2017 WL 5633152, at *12 (M.D. Fla. Nov. 21, 2017) ("The court's finding that [a witness] was [] qualified

16

to provide opinion testimony about the cause of the victim's wounds concerns the admissibility of evidence under Florida law, and must be given deference.").

In short, the postconviction court "authoritatively decided as a matter of [Florida] law" that Kennon's proposed objections were meritless. *Calhoun v. Warden, Baldwin State Prison*, 92 F.4th 1338, 1351 (11th Cir. 2024). It is well established that "[a] lawyer cannot be deficient for failing to raise a meritless claim." *Freeman v. Atty. Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008). Thus, the postconviction court reasonably concluded that counsel was not ineffective for failing to object to Porter's testimony. Ground Three is denied.[2]

### D.    Ground Four

Kennon contends that trial counsel was ineffective for failing to move to suppress his DNA sample. (Doc. 1 at 10). Law enforcement obtained the sample while investigating an unrelated homicide in June 2007—two years before the events of this case. (Doc. 5-5, Ex. 45, at 6-11). During the earlier investigation, Kennon's fingerprints "came back on a CD that was inside of a car . . . used during the homicide." (*Id.* at 18). Law enforcement subsequently sought "an elimination DNA sample" from Kennon. (*Id.*) He agreed to a buccal swab during an interview with law enforcement at his probation office. (*Id.* at 6, 10). Although Kennon was not charged for the earlier

---

[2] The postconviction court also considered Porter's testimony that Kennon had told her that "his injury resulted from falling off a motorcycle." (Doc. 5-5, Ex. 36, at 7). The court found that any hearsay objection to such testimony would have been meritless because Kennon's statement "clearly [fell] within the exception for medical diagnosis and treatment" under Fla. Stat. § 90.803(4). (*Id.*) Kennon's federal petition does not expressly contend that counsel was ineffective for failing to raise such an objection. Even if Kennon did raise this claim, it would fail because this Court is bound by the state court's determination that the hearsay objection lacked merit.

homicide, his DNA sample was later "used to match the blood found at the scene" of the July 2009 shooting. (*Id.* at 52). According to Kennon, counsel should have sought to suppress his DNA sample on the ground that his "consent [to the buccal swab] was not freely given." (Doc. 1 at 10).

The postconviction court rejected this claim after holding an evidentiary hearing. Sergeant Dennis Stahley and Detective Greg Price—the two officers who met with Kennon at his probation office—testified at the hearing. (Doc. 5-5, Ex. 45, at 5-6, 29). In its order rejecting Kennon's claim, the court summarized the officers' testimony. (*Id.*, Ex. 46, at 3-4). The court recounted that on June 7, 2007, "Sergeant Stahley and Detective Price arranged a meeting with [Kennon] at his probation office in order to question him about an unrelated homicide." (*Id.* at 3). Kennon "did not know these circumstances, and was only aware that he was reporting upon the probation officer's command." (*Id.*) The court noted that "[t]he officers were dressed in plain clothes with visible badges, identified themselves as law enforcement, and advised that they were investigating a homicide where [Kennon's] fingerprints were found on a CD in the suspect's vehicle." (*Id.* at 3-4). Sergeant Stahley conducted "an unrecorded pre-interview" during which Kennon "agreed to give a DNA sample." (*Id.* at 4). Sergeant Stahley testified that, during the pre-interview, he did not "threaten [Kennon] in any manner" to "give [him] th[e] sample," nor did he "imply in any manner that [Kennon] would be arrested or detained if" he declined to give the sample. (*Id.*, Ex. 45, at 7).

During the recorded portion of the interview, Sergeant Stahley noted that he had taken "two DNA swabs" from Kennon after "talk[ing] briefly off tape." (*Id.* at 10). Sergeant Stahley asked Kennon whether he "ha[d] a problem with that." (*Id.*) Kennon answered, "No, sir." (*Id.*) Sergeant Stahley then said, "I didn't threaten you or coerce you to do that, right?" (*Id.*) Kennon again responded, "No, sir." (*Id.*) Detective Price "was not present during the interview" because Kennon "objected to his presence." (*Id.*, Ex. 46, at 4).

Kennon's trial counsel also testified at the evidentiary hearing. As the postconviction court explained, counsel stated that she "knew that the meeting had previously occurred and that [Kennon] offered a DNA sample." (*Id.* at 5). Counsel also testified that "none of the facts alleged in the present motion would have prompted her to file a motion to suppress because she did not believe [Kennon] gave the sample involuntarily." (*Id.*) Indeed, counsel believed that Kennon "was eager to offer the sample in order to clear him[self] of suspicion in the unrelated homicide." (*Id.*)

The court ultimately found neither deficient performance nor prejudice from the failure to seek suppression, reasoning that Kennon "freely and voluntarily consented to give the DNA sample." (*Id.* at 4-5). The court explained that "[m]ost of the facts that would support a finding of involuntary consent [came] from the testimony of [Kennon], who stated that Detective Price patted him down and questioned him before the recorded interview and was inside the office blocking the exit during the interview." (*Id.* at 4). The court concluded, however, that Kennon's testimony was

"not credible," and "specifically [found] that Detective Price was not present during the interview" and did not "physically obstruct[] [Kennon's] exit during Sergeant Stahley's discussion with [Kennon]." (*Id.*) Accordingly, the court concluded that Kennon "failed to demonstrate that trial counsel's performance was deficient or that there was a reasonable probability the proposed motion to suppress would have changed the outcome of the proceedings." (*Id.* at 5).

The rejection of this claim was reasonable. "To obtain relief where an ineffective assistance claim is based on trial counsel's failure to file a [] motion to suppress, a petitioner must prove (1) that counsel's representation fell below an objective standard of reasonableness, (2) that the Fourth Amendment claim is meritorious, and (3) that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Zakrzewski v. McDonough*, 455 F.3d 1254, 1260 (11th Cir. 2006) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)). "Counsel is not ineffective for failing to file a meritless suppression motion." *United States v. Curbelo*, 726 F.3d 1260, 1267 (11th Cir. 2013).

Kennon argues that counsel should have sought suppression of the DNA sample on the ground that his consent to provide the sample was involuntary. "[A] warrantless search does not violate the Fourth Amendment where there is voluntary consent given by a person with authority." *United States v. Benjamin*, 958 F.3d 1124, 1134 (11th Cir. 2020). "Consent is voluntary if it is the product of an essentially free and unconstrained choice." *Id.* Voluntariness "is factual and depends on the totality of the circumstances." *Id.* at 1135. "When reviewing the totality of the circumstances,"

20

courts consider several factors, including "the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." *Id.*

The postconviction court reasonably determined that Kennon voluntarily consented to have his DNA sample taken. As an initial matter, the court credited the officers' account of the interview and declined to accord any weight to Kennon's testimony. Kennon fails to show that these credibility determinations were erroneous, so this Court is required to defer to them. *See Knight v. Fla. Dep't of Corr.*, 958 F.3d 1035, 1047 (11th Cir. 2020) ("[W]e must defer to the state postconviction court's credibility determinations."); *Nejad v. Att'y Gen., State of Ga.*, 830 F.3d 1280, 1292 (11th Cir. 2016) ("Federal habeas courts have no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.").

Having accepted the officers' version of events, the postconviction court reasonably concluded that Kennon voluntarily agreed to provide a DNA sample. Based on the officers' testimony, law enforcement did not use "coercive [] procedures" to secure Kennon's consent. *Benjamin*, 958 F.3d at 1135. To the contrary, Sergeant Stahley testified that he did not "threaten [Kennon]" or "imply in any manner that [Kennon] would be arrested or detained if" he declined to give a sample. (Doc. 5-5, Ex. 45, at 7). And during the recorded portion of the interview, Kennon agreed that Sergeant Stahley "didn't threaten[]" or "coerce" him to give the sample. (*Id.* at 10). Moreover, the record reflects that Kennon "cooperat[ed] with the officer[s]" and

"belie[ved] that no incriminating evidence [would] be found." *Benjamin*, 958 F.3d at 1135. Indeed, Kennon's trial counsel indicated that Kennon "was eager to offer the sample in order to clear him[self] of suspicion in the unrelated homicide." (Doc. 5-5, Ex. 46, at 5). In addition, Kennon does not argue that his "education and intelligence" weigh against a finding of voluntariness, nor does he show that he lacked "awareness of his right to refuse to consent." *Benjamin*, 958 F.3d at 1135.

In these circumstances, the postconviction court reasonably concluded that Kennon "freely and voluntarily consented to give the DNA sample." (Doc. 5-5, Ex. 46, at 5). As a result, counsel had no basis to challenge the voluntariness of Kennon's consent, and she cannot be deemed deficient for failing to file the proposed motion to suppress. *See Curbelo*, 726 F.3d at 1267 ("[C]ounsel is not ineffective for failing to file a meritless suppression motion."). Accordingly, Ground Four is denied.

### E.    Grounds Five and Six

In Ground Five, Kennon argues that trial counsel was ineffective for failing to seek suppression of his "DNA sample and results" as "illegally tested and seized without [his] consent." (Doc. 1 at 5). Kennon does not elaborate on this claim, but it appears that he intends to raise "Issue Five" from his Rule 3.850 motion. (Doc. 5-5, Ex. 35, at 317-E). In "Issue Five," Kennon argued that law enforcement violated the Fourth Amendment by "keep[ing]" his DNA—which was originally obtained in 2007—and using it in an unrelated "murder investigation [two] years later in 2009." (*Id.*) According to Kennon, "no consent was given to keep [the] DNA for [two] years,"

nor did he agree to allow law enforcement to "compare [his] DNA to other future crimes." (*Id.*)

Kennon raises a related claim in Ground Six of his federal habeas petition. Specifically, he contends that trial counsel was ineffective for failing to seek exclusion of the "DNA test results" based on "prosecut[orial] and official misconduct." (Doc. 1 at 6). According to Kennon, the "misconduct" stemmed from law enforcement's failure to "destroy[]" his DNA sample once he was cleared of suspicion in the 2007 homicide. (Doc. 5-5, Ex. 35, at 317-F). In support, Kennon cites "Florida and Federal Law," which according to him require that "all DNA samples obtained must be destroyed . . . if no arrest is made." (*Id.*)

The postconviction court rejected Grounds Five and Six. As for Ground Five, the court explained that "DNA samples, once validly obtained, can be used in unrelated prosecutions." (*Id.*, Ex. 38, at 4 (citing *Wyche v. State,* 987 So. 2d 23, 27-28 (Fla. 2008))). Thus, "[t]he limited scope of [Kennon's] consent ha[d] no bearing on law enforcement's ability to use the DNA sample in a later, unrelated investigation." (*Id.*) As for Ground Six, the court found that the State did not engage in "prosecutorial misconduct" by "retaining [Kennon's] prior DNA sample after he was cleared of suspicion in the unrelated investigation." (*Id.*, Ex. 36, at 9). The court explained that Florida law does not "require destruction of samples after a defendant is cleared of suspicion." (*Id.*) Instead, defendants whose samples are "obtained pursuant to arrest or conviction" may "petition for removal from the statewide database of DNA information." (*Id.*) The court held that, because Kennon's "DNA sample did not arise

23

from an arrest or conviction, the proposed claim of prosecutorial misconduct would have been meritless." (*Id.*)

The rejection of these claims was reasonable. Courts have uniformly held that "the Fourth Amendment does not bar the police from using lawfully-obtained DNA samples in unrelated criminal investigations." *State v. Gibson*, 150 So. 3d 1240, 1244 (Fla. 3d DCA 2014) (collecting cases); *see also Boroian v. Mueller*, 616 F.3d 60, 67-68 (1st Cir. 2010) (holding that the "government's retention and matching of Boroian's [DNA] profile against other profiles in CODIS does not violate an expectation of privacy that society is prepared to recognize as reasonable"); *Johnson v. Quander*, 440 F.3d 489, 499 (D.C. Cir. 2006) ("[A]ccessing the DNA snapshots contained in the CODIS database does not independently implicate the Fourth Amendment.").[3] Likewise, "consent to DNA identification is not involuntary merely because the [suspect] is not informed that the identification will be used in other investigations." *People v. Collins*, 250 P.3d 668, 674 (Colo. App. 2010). Accordingly, counsel had no basis to argue that the Fourth Amendment barred law enforcement from retaining and subsequently using Kennon's DNA in an unrelated investigation.

Kennon also maintained that Florida law required the destruction of "all DNA samples" "if no arrest [was] made." (Doc. 5-5, Ex. 35, at 317-F). As noted above,

---

[3] *See also, e.g.*, *State v. Bowman*, 337 S.W.3d 679, 685 (Mo. 2011) ("Bowman cites no case standing for the proposition that the Fourth Amendment bars law enforcement from using lawfully obtained personal information in an unrelated criminal investigation. If that were the case, the commonplace practice of identifying a suspect based on fingerprints lawfully obtained during a previous criminal investigation would constitute a Fourth Amendment violation. The rule is no different rule because the identifying feature is DNA obtained pursuant to a court ordered blood sample.").

however, the postconviction court held that Florida law does not "require destruction of samples after a defendant is cleared of suspicion." (*Id.*, Ex. 36, at 9). This Court has "no authority to question" the state court's interpretation of Florida law. *Calhoun*, 92 F.4th at 1351. And because Florida law—as authoritatively interpreted by the state court—does not mandate destruction of DNA samples for suspects cleared of suspicion, counsel was not deficient for failing to seek suppression on that basis.

In short, the postconviction court reasonably determined that counsel was not ineffective for failing to raise Kennon's meritless arguments. *See Freeman*, 536 F.3d at 1233 ("A lawyer cannot be deficient for failing to raise a meritless claim."). Accordingly, Grounds Five and Six are denied.

## F.     Ground Seven

Kennon contends that trial counsel was ineffective for failing to "file a motion to dismiss" on the ground that "probable cause was insufficient" to justify his arrest. (Doc. 1 at 14). Kennon elaborated on this claim in his Rule 3.850 motion, arguing that the sole basis for his arrest was "his alleged DNA being found in a public area on a sidewalk at a large apartment complex." (Doc. 5-5, Ex. 35, at 317-G). According to Kennon, this evidence "was insufficient to establish probable cause for murder." (*Id.*)

The postconviction court rejected this claim, finding that "law enforcement had sufficient probable cause for [Kennon's] arrest." (*Id.*, Ex. 36, at 10). In support, the court cited the following facts from the "probable cause affidavit": (1) unknown men "forcibly entered into the [victims'] residence"; (2) "shots were fired and likely hit at least one of the intruders"; (3) "blood evidence was found on the metal rail, on the

pavement, and on a plastic cap in the grassy area near the crime scene"; (4) a passerby saw "masked males running in the direction where the blood evidence was found"; (5) "police obtained a second male profile from blood drops found outside the victim's apartment door"; (6) "police received several anonymous tips that [Kennon] was involved in this murder and suffered a gunshot wound"; and (7) "[Kennon's] DNA standard matched the DNA profile from the blood on the sidewalk." (*Id.*) Based on these facts, the court had "little doubt that a motion to dismiss for lack of probable cause would have been unsuccessful." (*Id.* at 10-11). As a result, the court found that counsel was not deficient for failing to raise Kennon's probable-cause argument. (*Id.*)

The postconviction court correctly rejected this claim. The Fourth Amendment protects "the right to be free from arrest without probable cause." *Barnett v. MacArthur*, 956 F.3d 1291, 1296 (11th Cir. 2020). "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018). Probable cause requires only "a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983).

Law enforcement had probable cause to arrest Kennon. The probable cause affidavit noted that Lawrence Funsch, one of the victims, "thought he shot one of the intruders," and that "[a] blood trail was located at the crime scene leading from the apartment to and through the southeast gate of the complex." (Doc. 5-2, Ex. 4, at 2).

26

According to the affidavit, Kennon's DNA profile matched blood found "on the sidewalk approximately 15 feet from the front door of the [victims'] apartment." (Doc. 5-2, Ex. 4, at 2, 5). Taken together with the other information in the affidavit—including the anonymous tips regarding Kennon's involvement—these facts were sufficient to establish "a probability or substantial chance [that Kennon had engaged in] criminal activity." *Gates*, 462 U.S. at 243 n.13; *see also Craig v. Singletary*, 127 F.3d 1030, 1046 (11th Cir. 1997) ("An anonymous tip does not, of itself, satisfy probable cause requirements, but it is information that may be considered if corroborated." (citation omitted)); *James v. City of Albany*, 833 F. App'x 346, 347 (2d Cir. 2020) (holding that "the district court properly concluded as a matter of law that defendants had probable cause to arrest James because his DNA matched blood taken from the victim's car").

Accordingly, the state court reasonably concluded that counsel was not deficient for failing to raise Kennon's meritless challenge to his arrest. *See Freeman*, 536 F.3d at 1233 ("A lawyer cannot be deficient for failing to raise a meritless claim."). Ground Seven is therefore denied.

## G.    Ground Eight

Finally, Kennon argues that trial counsel was ineffective for failing to file a "new motion to suppress" based on allegedly false statements made by two witnesses at his suppression hearing. (Doc. 1 at 15; *see also* Doc. 5-5, Ex. 35, at 317-H). Kennon moved to suppress the 10-millimeter magazine recovered from the vehicle parked outside his residence. (Doc. 5-2, Ex. 10). He argued that, although law enforcement had secured

27

a search warrant for his house, "[n]o search warrant had been obtained for [his] automobile." (*Id.* at 1).

The trial court held a suppression hearing, taking testimony from Detective Daniel Parham, Crime Scene Technician Adrianne Walls, and Detective Jeffrey Bliss. (*Id.*, Ex. 13). Detective Bliss stated that he had obtained the search warrant for Kennon's house. (*Id.* at 39). He testified that, although "language . . . about searching vehicles on the curtilage" is "ordinarily" included in residential search warrants, he had inadvertently omitted such language from the search warrant for Kennon's house. (*Id.* at 40-41). According to Detective Bliss, at some point during the search, he realized "that the warrant did not authorize [him] to search the vehicle." (*Id.* at 42). At that point, his plan was to "secure the vehicle and search it at a later time." (*Id.* at 41). Soon after, however, Detective Bliss learned that Detective Parham had already "searched the vehicle" and found the magazine. (*Id.* at 41-42). Detective Bliss spoke to his supervisor, who instructed him to "secure the vehicle and have it preserved pending the issuance [of] a search warrant." (*Id.* at 42-43). Detective Bliss had the vehicle towed to "the sheriff's office impound facility" and subsequently obtained a search warrant for the vehicle. (*Id.* at 43). The application for that warrant did not mention the magazine found in the car. (*Id.* at 46). Law enforcement searched the vehicle a second time and seized the magazine. (*Id.* at 43).

Detective Parham testified that, during the execution of the search warrant at Kennon's residence, a "detective" told him to search the vehicle. (*Id.* at 24). He said

he "believe[d]" Detective Bliss gave the instruction to search the vehicle, but clarified that "[i]t could have been another detective." (*Id.*) For her part, Walls testified that Detective Parham "summoned" her to the vehicle, where she examined and collected the 10-millimeter magazine. (*Id.* at 34). Walls stated that she "later" had "occasion to replace it inside" the vehicle, but she did not elaborate on when that occurred. (*Id.*) At trial, she testified that she put the magazine back in the vehicle after it had arrived at the impound facility. (Doc. 5-3, Ex. 25, at 420).

Following the evidentiary hearing, the court denied the motion to suppress in a written order. (Doc. 5-2, Ex. 21). The court held that the initial search of Kennon's vehicle "was not proper" because the search warrant did not encompass the car. (*Id.* at 6). Nevertheless, the court concluded that "the subsequent search of [Kennon's] vehicle, based on the second search warrant, was proper." (*Id.*) It reached that conclusion by applying the independent-source doctrine—the rule that "[a] search warrant which is valid without reliance upon observations or information from [prior] illegal conduct is an independent source which breaks the causal link between the illegal conduct and the final search or seizure." (*Id.* (citation omitted)). Citing the affidavit for the second search warrant, the court found that "probable cause existed to issue a search warrant of the vehicle, independent of the previous search of [Kennon's] car." (*Id.*) The court also credited Detective Bliss's testimony that "the decision to seek the search warrant for the car was not prompted by the discovery of the magazine." (*Id.* at 8). The court therefore denied the motion to suppress. (*Id.*)

In his federal habeas petition, Kennon contends that trial counsel should have filed a "new motion to suppress" based on allegedly false testimony provided by Walls and Detective Bliss at the suppression hearing. (Doc. 1 at 15; *see also* Doc. 5-5, Ex. 35, at 317-H). Kennon elaborated on this claim in his Rule 3.850 motion. There, he argued that Walls "presented false testimony" at the suppression hearing when she allegedly stated that she had placed the 10-millimeter magazine back in the vehicle *before* it was towed. (Doc. 5-5, Ex. 35, at 317-H). According to Kennon, the falsity of this alleged statement became apparent at trial, where Walls "changed her story" and testified that she did not place the magazine back in the car until *after* it had arrived at the impound facility. (*Id.*) Kennon also argued that Detective Bliss falsely testified at the suppression hearing that, once he realized the initial search warrant did not cover the vehicle on the property, he planned to "secure the vehicle and search it at a later time." (Doc. 5-2, Ex. 13, at 41). According to Kennon, this testimony was false because Detective Parham allegedly stated at the suppression hearing that Detective Bliss had instructed him to search the vehicle on the property. (Doc. 5-5, Ex. 35, at 317-H). Kennon argues that counsel should have raised these alleged *Giglio*[4] violations in a renewed motion to suppress. (*Id.*; *see also* Doc. 1 at 15).

The postconviction court rejected this claim. First, it held that Kennon's "argument as to Detective Bliss [was] based on testimony that was presented to the [trial court] during the suppression hearing and considered in [its] ruling." (Doc. 5-5,

---

[4] *Giglio v. United States*, 405 U.S. 150 (1972).

Ex. 36, at 11). The court held that, because "counsel properly moved to suppress the contested evidence and elicited the testimony on which [Kennon] now relies, this claim amount[ed] to a claim of trial court error in its ruling on the suppression motion, a claim not cognizable under Rule 3.850." (*Id.*) Second, the court found that Kennon failed to establish a *Giglio* violation based on Walls's testimony. (*Id.* at 11-12). The court explained that, at the suppression hearing, Walls "testified that she originally collected the magazine, but later placed it back inside the vehicle where it was found." (*Id.* at 11-12). At trial, the court noted, Walls "testified that she brought the magazine from the location of the search warrant to the impound facility in her own vehicle." (*Id.* at 12). Reviewing these statements, the court found an absence of "clear testimony regarding when [Walls] placed the magazine back into the vehicle." (*Id.*) Thus, the court concluded, Kennon failed to "demonstrate that [Walls's] testimony was false," and counsel was not ineffective for failing to raise the alleged *Giglio* violation. (*Id.*)

The rejection of this claim was reasonable. "To establish a *Giglio* claim, a habeas petitioner must prove: (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, *i.e.*, that there is any reasonable likelihood that the false testimony could . . . have affected the judgment." *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1348 (11th Cir. 2011). "[T]he suggestion that a statement may have been false is simply insufficient [to establish a *Giglio* violation]; the defendant must conclusively show that the statement was actually false." *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1313

(11th Cir. 2005). "[A] prior statement that is merely inconsistent with a government witness's testimony is insufficient to establish" that the government knowingly used false testimony. *United States v. McNair*, 605 F.3d 1152, 1208 (11th Cir. 2010); *see also Hays v. State of Alabama*, 85 F.3d 1492, 1499 (11th Cir. 1996) (finding no due process violation where "there ha[d] been no showing that [the witness's] later, rather than earlier, testimony was false"). Likewise, a petitioner cannot establish a *Giglio* violation simply by showing "that [a witness's] testimony is challenged by another witness." *United States v. Brown*, 634 F.2d 819, 827 (5th Cir. 1981); *see also Crystal v. Inch*, No. 3:20-cv-5565-LC-MAF, 2021 WL 5814141, at *22 (N.D. Fla. Nov. 3, 2021) ("[T]hat two prosecution witnesses presented conflicting testimony does not constitute a *Giglio* violation."), *adopted by* 2021 WL 5810410 (N.D. Fla. Dec. 7, 2021).

Kennon's *Giglio* claim fails because he cannot show that "the prosecutor knowingly used perjured testimony" from Walls or Detective Bliss. *Guzman*, 663 F.3d at 1348. As for Walls, Kennon argues that her trial testimony about the magazine was inconsistent with the testimony she gave on that topic at the suppression hearing. But even if Walls's "[trial] testimony was inconsistent with [her] prior statements, that is not sufficient to establish the knowing use of false testimony." *White v. Sec'y, Fla. Dep't of Corr.*, No. 15-12950-F, 2015 WL 13936935, at *9 (11th Cir. Dec. 18, 2015). Likewise, even assuming that Detective Bliss and Detective Parham offered conflicting accounts of who ordered the search of the vehicle, it does not follow that the prosecution knowingly presented false testimony. *See United States v. Michael*, 17 F.3d

1383, 1385 (11th Cir. 1994) ("We refuse to impute knowledge of falsity to the prosecutor where a key government witness'[s] testimony is in conflict with another's statement or testimony.").

Because Kennon's *Giglio* claim is meritless, counsel was not ineffective for failing to pursue it in a "new" suppression motion.[5] *See Freeman*, 536 F.3d at 1233 ("A lawyer cannot be deficient for failing to raise a meritless claim."). Accordingly, the postconviction court reasonably rejected Kennon's ineffective-assistance claim, and Ground Eight is denied.

It is therefore **ORDERED** that Kennon's petition (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Kennon and to **CLOSE** this case.

<u>**Certificate of Appealability**</u>
<u>**and Leave to Appeal *In Forma Pauperis* Denied**</u>

It is further **ORDERED** that Kennon is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a certificate of appealability must first issue. *Id*. "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id*. at § 2253(c)(2). To obtain a certificate of appealability, Kennon must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v.*

---

[5] The Court would reach the same conclusion even if *de novo* review applied to this claim.

*McDaniel*, 529 U.S. 473, 484 (2000). Kennon has not made the requisite showing.

Finally, because Kennon is not entitled to a certificate of appealability, he is not

entitled to appeal *in forma pauperis*.

      **DONE** and **ORDERED** in Tampa, Florida on May 20, 2024.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Petitioner, *pro se*